# IN THE SUPREME COURT OF IOWA

No. 21–1652

Submitted December 14, 2022—Filed February 10, 2023

**IN THE MATTER OF THE SUBPOENAS ISSUED TO DETHMERS MANUFACTURING COMPANY,**

**DETHMERS MANUFACTURING COMPANY,**

Appellant.

---

Appeal from the Iowa District Court for Osceola County, Nancy L. Whittenburg, Judge.

An Iowa manufacturing company appeals the district court's refusal to quash subpoenas that require production of documents and testimony for use in a Louisiana products-liability case. **REVERSED AND REMANDED.**

May, J., delivered the opinion of the court, in which all justices joined. Waterman, J., filed a concurrence, in which Mansfield, J., joined.

Daniel E. DeKoter (argued) of DeKoter, Thole, Dawson, Rockman & Krikke, P.L.C., Sibley, for appellant.

Frederick W. James (argued) of The James Law Firm, P.C., Des Moines, and Nicholas A. Blanda of Anderson, Dozier, Blanda & Saltzman, Lafayette, Louisiana, for appellee Tharun Mittapalli.

**MAY, Justice.**

Subpoenas are powerful tools. By serving subpoenas, private parties and their attorneys can compel free citizens to appear at specified places, give sworn testimony, produce documents, and more. But with this power comes responsibility. *See, e.g.*, 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2453, at 396 (3d ed. 2008) ("[T]he lawyer's . . . power to issue subpoenas is accompanied by . . . professional responsibility with regard to using it appropriately . . . ."). An attorney or party who serves a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Iowa R. Civ. P. 1.1701(4)(*a*). "The issuing court must enforce this duty and impose an appropriate sanction, which may include lost earnings and reasonable attorney's fees, on a party or attorney who fails to comply." *Id.* And "[o]n timely motion, the issuing court must quash or modify a subpoena that . . . [s]ubjects a person to undue burden." *Id.* r. 1.1701(4)(*d*)(1)(4).

In this case, a plaintiff in a Louisiana products-liability suit used Iowa's interstate discovery procedures to serve subpoenas on Dethmers Manufacturing Company, an Iowa firm. *See* Iowa R. Civ. P. 1.1702 (permitting parties to foreign proceedings to issue subpoenas in Iowa). Dethmers was not (and is not) a party in the Louisiana suit. And Dethmers has no direct interest in the suit. Even so, the subpoenas commanded Dethmers to provide twenty-two categories of documents and testimony. Many of those categories are extraordinarily broad. Fairly read, the subpoenas required Dethmers to produce every document that has anything to do with its trailer-coupling business—and then to also provide

sworn testimony about every facet of that business. Dethmers moved to quash the subpoenas. The district court declined. Dethmers appeals.

We conclude that these subpoenas imposed undue burdens on Dethmers. Dethmers's motion to quash the subpoenas should have been granted. We reverse and remand with instructions.

## I. Background Facts and Proceedings.

On November 22, 2016, Tanika Adams was driving an SUV in Louisiana. Adams was pulling a U-Haul trailer. Adams's SUV was equipped with a hitch ball, and the trailer was equipped with a coupler. The coupler attached the trailer to the SUV's hitch ball.

While Adams was traveling west on Interstate 10, the coupler became detached from the hitch ball. So Adams pulled the SUV to the right shoulder. But part of the trailer remained in the travel lane.

Tharun Mittapalli and two friends were also driving west on Interstate 10. They pulled over and tried to help Adams.

Meanwhile, a tractor trailer was also headed west on Interstate 10. It struck the U-Haul trailer, the SUV, and the people. Mittapalli was seriously injured. His accrued medical expenses exceed $1.2 million. Adams was also seriously injured. One of Mittapalli's friends was killed.

Mittapalli sued U-Haul and others in Louisiana state court. Mittapalli claims that a defect in the coupler caused the detachment. More specifically,

Mittapalli claims that the coupler was unreasonably dangerous because of a design defect.[1]

Under Louisiana law, Mittapalli's unreasonably-dangerous-design claim requires proof that "at the time the product left its manufacturer's control[,] . . . [t]here existed an alternative design for the product that was capable of preventing the claimant's damage." La. Stat. Ann. § 9:2800.56(1) (2017). It also requires proof that "at the time the product left its manufacturer's control[,] . . . [t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." *Id.* § 9:2800.56(2).

Mittapalli believes that Dethmers has information that could help him meet these requirements. Dethmers designs, manufactures, and sells couplers. And although Dethmers did not manufacture the coupler involved in the collision,[2] Dethmers has sold couplers to U-Haul. Specifically, Mittapalli claims that "after the catastrophic incident, U-Haul began to implement the Dethmers EZ Latch Coupler (which U-Haul deems the 'Drop & Tow Automatic Coupler') into their fleet of tow trailers." And Mittapalli believes that there are important differences between (1) the coupler that was involved in the accident and (2) the Dethmers-designed EZ Latch Coupler. Specifically, Mittapalli believes that Dethmers's design was (to paraphrase the Louisiana statute) a feasible

[1]Mittapalli made other claims, too. But they are not relevant here.

[2]Nor does Dethmers have any other involvement in Mittapalli's Louisiana case.

alternative design that probably would have prevented the detachment and subsequent injuries.

So Mittapalli filed a "Motion for Issuance of a Foreign Subpoena Duces Tecum" and a "Motion for Issuance of a Subpoena for Deposition" in Iowa district court. The court opened a separate file for each. Mittapalli then served two subpoenas on Dethmers: one for documents and one for deposition testimony. The document subpoena required Dethmers to produce twenty-two categories of "documents"—a term that, according to the subpoena, includes "writings, drawings, graphs, charts, photographs, phone records, computer generated or stored data, electronically stored information, and other data compilations from which information can be obtained, translated, if necessary, by [Dethmers] through detection devices into reasonably usable form." The deposition subpoena required Dethmers to produce a "duly authorized corporate representative" who "must have sufficient knowledge and qualifications to testify regarding" the same twenty-two categories. Here are the twenty-two categories, verbatim:

1. The general scope of Dethmer/Demco's business as it relates to the design, development, and manufacturing of trailer coupling devices.

2. Dethmer/Demco's history of designing, manufacturing, and/or selling hand wheel couplers and/or lever latch couplers.

3. Facts and circumstances surrounding the design, development, and manufacturing of the Demco EZ Latch coupler.

4. The utility, function, benefits and/or purpose of the Demco EZ Latch coupler.

5. All patent applications and/or awards regarding the Demco EZ Latch coupler.

6. All engineering drawings, testing reports, schematics, diagrams, plans, blueprints, electronically stored information, video, or other documents or tangible items that depict, describe, discuss, refer to, or relate to the design, assembly, testing and/or construction of the Demco EZ Latch coupler.

7. All safety and/or instructions manuals, documents, warnings and/or electronic communication (i.e. computer or video links) regarding the Demco EZ Latch coupler including, but not limited to engineering drawings, testing reports, schematics, diagrams, plans, warnings, instructions, blueprints, electronically stored information, video, correspondence, electronic communication, etc.

8. All communications, marketing and/or negotiations with U-Haul International, Inc. (hereinafter "U-Haul") and/or other customers regarding the utility, function, benefits, safety, and/or purpose of the Demco EZ latch coupler.

9. The approximate date and/or time frame that Dethmer/Demco introduced the Demco EZ Latch coupler for sale to the public, including, but not limited to customers such as U-Haul.

10. All communications, marketing and/or negotiations with U-Haul and/or other customers regarding the purchase, sale, use, and/or implementation Demco EZ Latch couplers.

11. All communications, promotions, and/or marketing with U-Haul and/or any other customers regarding whether the Demco EZ Latch couplers could potentially improve safety and/or reduce liabilities.

12. The approximate date and/or time frame that Dethmers/Demco first began communications, marketing and/or negotiations with U-Haul regarding the potential purchase, sale, use, and/or implementation of Demco EZ Latch couplers.

13. All documents and electronic communication between Dethmers/Demco and U-Haul regarding the utility, function, benefits, safety, and/or purpose of the Demco EZ Latch coupler.

14. Facts and circumstances surrounding U-Haul's purchase, use, and/or implementation of Demco EZ Latch couplers in their fleet of towing equipment.

15. All documents, contracts, agreements, and/or electronic communication between Dethmers/Demco and U-Haul regarding U-Haul's purchase, use and/or implementation of Demco EZ Latch couplers in their fleet of towing equipment.

16. Communications, marketing and/or negotiations with U-Haul and/or other customers regarding the replacement and/or retrofitting of hand wheel and/or lever latch couplers with Demco EZ Latch couplers.

17. All documents, contracts, communications and/or agreements regarding the price and/or cost paid by U-Haul for Demco EZ couplers (purchase, retrofit, etc.).

18. All studies, testing, analysis, investigation and/or statistical data with respect to decoupling and/or detachment incidents involving the Demco EZ Latch Coupler.

19. All studies, testing, analysis, investigation and/or statistical data with respect to decoupling and/or detachment incidents involving non-EZ Latch coupler designs such as hand wheel couplers, lever latch couplers, etc.

20. All communications with U-Haul and/or any other customers regarding studies, testing, analysis, investigation and/or statistical data with respect to decoupling and/or detachment incidents involving the Demco EZ Latch coupler versus non-EZ Latch coupler designs such as hand wheel couplers, level latch couplers, etc.

21. Annual sales volume of new and/or replacement/retrofit EZ Latch Couplers from January 1, 2006 to the present.

22. Annual sales volume of new and/or replacement/retrofit EZ Latch Couplers to U-Haul from January 1, 2006 to the present.

Dethmers responded by moving to quash the subpoenas. Dethmers argued that compliance would impose undue burden on Dethmers, require production of protected trade secrets and other confidential commercial information, and require Dethmers's employees to serve as unretained experts. Dethmers also noted that Mittapalli could obtain the information that he needed from other sources, including discovery requests in the Louisiana case, public records, and

Mittapalli's own retained expert. As support for its motion, Dethmers filed an affidavit of Kevin Ten Haken, Dethmers's Executive Vice President. Parts of the affidavit are reproduced here:

10. Most of the categories of topics and documents described in the applications are addressed to trade secret, proprietary and confidential information of Dethmers. The following categories seek information which Dethmers keeps in confidence and does not allow to be disseminated to persons outside of its business operations:

. . . . [here, the affidavit recited verbatim the text of requests 1–3, 6–8, and 10–22].

11. The trailer parts business is highly competitive and involves margins that are easily affected by changes in sales. The information described in the categories listed above would, in my opinion, provide our competitors with an undue advantage if disseminated to them, and could affect our sales of couplers.

12. To the extent that we can understand what is being asked of us, the information in the above categories would require substantial expense and man-hours to gather. Gathering this information would involve examination of many physical files and computer files. Dethmers' business records are not kept in a way that corresponds with these categories. Gathering these records would adversely impact Dethmers' business operations and affect Dethmers' income by devoting man-hours to useless activity instead of profitable activity.

Mittapalli resisted. Dethmers then filed a supplemental affidavit. In it, Ten Haken further emphasized the competitive nature of the coupler business and the confidential and proprietary nature of much of the information sought.

At a hearing, the district court received exhibits and heard argument on Dethmers's motions. A few days later, the court issued an order denying Dethmers's motion to quash but directing the parties to "jointly tender a proposed" protective order for the court's consideration.

Dethmers moved to reconsider. The court again declined to quash the subpoenas. This appeal followed. In his appellee's brief, Mittapalli announced that he has now settled with U-Haul. Now, Mittapalli says, the Louisiana case is focused on Horizon Global Americas, Inc., who allegedly manufactured the trailer coupler that failed.

**II. Analysis.**

Dethmers argues that the district court abused its discretion by refusing to quash the subpoenas. We agree.

**A. Standard of Review.** Generally speaking, "[w]e review discovery rulings for abuse of discretion." *Vaccaro v. Polk County*, 983 N.W.2d 54, 57 (Iowa 2022). "A ruling based on an erroneous interpretation of a discovery rule can constitute an abuse of discretion." *Id.* (quoting *Mitchell v. City of Cedar Rapids*, 926 N.W.2d 222, 227 (Iowa 2019)). We review the "interpretation of our rules of civil procedure for errors at law." *Reis v. Iowa Dist. Ct.*, 787 N.W.2d 61, 66 (Iowa 2010).

**B. Jurisdiction.** Before reaching the merits, we must consider a jurisdictional issue. Generally speaking, civil litigants have a right of appeal only from final orders or judgments. Iowa R. App. P. 6.103(1). *But see, e.g.*, *id.* (noting exceptions). An order is "final" if it "conclusively adjudicates all of the rights of the parties," *Richers v. Marsh & McLennan Grp. Assocs.*, 459 N.W.2d 478, 480 (Iowa 1990), and leaves the district court with "nothing more to do than execute that order," *In re M & S Grading, Inc.*, 526 F.3d 363, 369 (8th Cir. 2008). *See In re Marriage of Brown*, 776 N.W.2d 644, 648 (Iowa 2009) ("It must leave nothing

more to be done in order to effectuate the court's disposition of the matter."
(quoting *Rohrbeck v. Rohrbeck*, 566 A.2d 767, 774 (Md. 1989))). Ordinarily,
discovery orders don't fit this definition. They don't resolve all disputes before
the court. They don't end the litigation. Rather, in most cases, discovery orders
are just small steps in a litigation odyssey that cannot end without a trial,
dispositive motion, or voluntary dismissal. So discovery orders are usually
considered interlocutory—not final—and they may not be appealed as of right.
Rather, a "party aggrieved" by a discovery order usually has to apply "for
permission" to pursue an interlocutory appeal. Iowa R. App. P. 6.104(1); *see, e.g.*,
*Vaccaro*, 983 N.W.2d at 56–57 (addressing discovery issues through an
interlocutory appeal).

But this case is unusual. Here we are dealing with special actions for
interstate discovery under Iowa Rules of Civil Procedure 1.1701 and 1.1702. In
these actions, discovery is not secondary. Rather, in these special actions,
discovery is the *only* issue before our courts. More specifically, in these cases,
the only question is whether and to what extent Dethmers must comply with
Mittapalli's subpoenas. The district court resolved this issue by refusing to quash
the subpoenas. This refusal amounted to a final order. So Dethmers was entitled
to appeal.

Of course, we recognize that "[a] ruling is not final when the trial court
intends to do something further to signify its final adjudication of the case." *In re
Marriage of McCreary*, 276 N.W.2d 399, 400 (Iowa 1979). We also recognize that
in its initial order denying Dethmers's motion to quash, the court directed the

parties to "jointly tender a proposed" protective order for the court's consideration. The resulting protective order could have altered Dethmers's obligations under the subpoenas. In fact, the court noted that "a protective order could appropriately mitigate unreasonable expenditures of time and money expended for compliance" with the subpoenas.

But in its ruling on Dethmers's motion to reconsider, the court "suspended" the protective-order requirement "pending disposition of Dethmers' planned appeal." We read this to mean that once the court denied the motion to reconsider, the court did not intend to take any further action. This confirms our view that Dethmers appealed from a final order.

**C. Merits.** Different provisions of law authorize different kinds of subpoenas. For instance, Iowa Code section 11.51 gives the state auditor "power to issue subpoenas of all kinds." *Sand v. Doe*, 959 N.W.2d 99, 105 (Iowa 2021) (quoting Iowa Code § 11.51 (2020)). Other statutes grant subpoena powers to various other government actors, such as the ombudsman, Iowa Code § 2C.9 (2021), and the attorney general, *id.* § 714.16.

In this case, we consider subpoenas authorized by Iowa Rules of Civil Procedure 1.1701 and 1.1702. These rules provide powerful tools for civil litigants. By issuing subpoenas, attorneys in civil cases can require free citizens to produce their private documents, testify in depositions, appear at hearings and trials, and more.

As noted, though, rule 1.1701 includes important protections for persons subject to subpoenas. Under subsection 4(*a*), "[a] party or attorney responsible

for issuing and serving a subpoena *must* take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Iowa R. Civ. P. 1.1701(4)(*a*) (emphasis added). And subsection 4(*d*)(1)(4) provides that "[o]n timely motion, the issuing court *must* quash or modify a subpoena that . . . [s]ubjects a person to undue burden." *Id.* r. 1.1701(4)(*d*)(1)(4) (emphasis added).

But how should the court decide whether a subpoena imposes "undue burden"? The district court applied a four-factor inquiry described in *State ex rel. Miller v. Publishers Clearing House, Inc.*, 633 N.W.2d 732, 738 (Iowa 2001) (en banc). We do not believe that authority is especially relevant here. *Miller* involved investigative subpoenas issued by the attorney general as an exercise of his[3] "plenary investigative powers" under our consumer fraud statute, Iowa Code section 714.16. *Id.* at 734–35. *Miller* does not govern the (very different) subpoenas at issue here, which are governed by rule 1.1701, and may be issued by any attorney in almost any civil case.

Instead, we adopt a test that federal courts apply under Federal Rule of Civil Procedure 45, on which rule 1.1701 is modeled. Under this test, "[t]o determine whether a subpoena presents an undue burden," the court should weigh the following factors: "(1) [the] relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden

---

[3]At the time *Miller* was decided, the attorney general was Tom Miller.

imposed." *Leonard v. Martin*, 38 F.4th 481, 489 (5th Cir. 2022) (alteration in original) (quoting *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004)); *accord In re: Mod. Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018); *In re Zouzar Bouka; Vision Indian Ocean S.A.*, ___ F. Supp. 3d ___, ___, 2022 WL 15527657, at *11 (S.D.N.Y. Oct. 28, 2022); *In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 501 (D.N.J. 2021); *Dell Inc. v. DeCosta*, 233 F. Supp. 3d 1, 3 (D.D.C. 2017); *Pebble Ltd. P'ship v. Env't Prot. Agency*, 310 F.R.D. 575, 580 (D. Alaska 2015); *W Holding Co. v. Chartis Ins. Co. of Puerto Rico*, 42 F. Supp. 3d 319, 322 (D.P.R. 2014); *Davis v. Carmel Clay Schs.*, 282 F.R.D. 201, 210 (S.D. Ind. 2012), *on reconsideration in part*, 286 F.R.D. 411, 413 (S.D. Ind. 2012); *Precourt v. Fairbank Reconstruction Corp.*, 280 F.R.D. 462, 467 (D.S.D. 2011); *Achte/Neunte Boll Kino Beteiligungs Gmbh & Co. v. Does 1–4,577*, 736 F. Supp. 2d 212, 214 (D.D.C. 2010); *Zoltek Corp. v. United States*, 104 Fed. Cl. 647, 656 (2012).

We mention three additional points that courts should bear in mind when applying this test. First, we emphasize the need to protect nonparties. *See, e.g.*, *Rossman v. EN Eng'g, LLC*, 467 F. Supp. 3d 586, 590 (N.D. Ill. 2020) ("[C]ourts have consistently held that 'non-party status' is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue."); *Whitlow v. Martin*, 263 F.R.D. 507, 512 (C.D. Ill. 2009) ("Non-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue."). While *parties* to a lawsuit must accept the burden of discovery "as a natural concomitant of modern civil litigation[,] . . .

[n]on-parties have a different set of expectations." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998). Because they are "strangers" to the dispute—they have "no dog in [the] fight"—they should not be exposed to the same burdens as the parties. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019) (alteration in original) (quoting *Cusumano*, 162 F.3d at 717); *see also id.* at 194 (noting that nonparties "deserve special solicitude"). "[C]oncern for the unwanted burden thrust upon non-parties is a factor entitled to special weight" when applying the test. *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 927 (8th Cir. 1999) (quoting *Cusumano*, 162 F.3d at 717).

Second, although the test includes several factors, this does not mean that all factors must carry equal weight in every case. One factor (or two) could be determinative, depending on the case. For instance, if a subpoena requests documents that have no relevance to a litigated issue, the request automatically fails. Similarly, if the requesting party fails to show that they *need* to obtain documents or information from a nonparty, the subpoena may be quashed entirely. *Rossman*, 467 F. Supp. 3d at 590 ("A non-party subpoena seeking information that is readily available from a party through discovery may be quashed as duplicative or cumulative."); *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 410 (C.D. Cal. 2014) (collecting cases and noting that "[c]ourts are particularly reluctant to require a non-party to provide discovery that can be produced by a party"). So parties who impose subpoena obligations on nonparties must be prepared to show that they couldn't

have satisfied their needs by other means, such as discovery requests to "one of the parties to the litigation." *Jordan*, 921 F.3d at 189; *see Precourt*, 280 F.R.D. at 467 ("If the party seeking the information can easily obtain the same information without burdening the nonparty, the court will quash the subpoena.").

Finally, we emphasize that attorneys and parties must *frontload* their efforts to "avoid imposing undue burden or expense on a person subject to the subpoena." Iowa R. Civ. P. 1.1701(4)(*a*); *see, e.g.*, *Mod. Plastics Corp.*, 890 F.3d at 251 ("[F]ailure narrowly to tailor a subpoena may be a ground for sanctions . . . ." (quoting *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1185 (9th Cir. 2013))). It is not enough to say that although a subpoena was obviously too broad when it was served, its onerous demands were just a starting point for a future negotiation that would likely lead the issuing attorneys to settle for less. We reject strategies of this kind. Subpoenas carry the power of the court. *See, e.g.*, Fed. R. Civ. P. 45 advisory committee's note to 1991 amendment ("[D]efiance of a subpoena is . . . an act in defiance of a court order and exposes the defiant witness to contempt sanctions."). We must avoid any abuse of that power. To the extent practicable, then, subpoenas must be reasonable—they must not be unduly burdensome—*when* they are served. And so, an issuing party must properly tailor its subpoenas *before* they are served. *See Jordan*, 921 F.3d at 190 ("A nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs; *the requesting party should have done that before serving it.*" (emphasis added)).

With these principles in mind, we consider the document subpoena that Mittapalli served on nonparty Dethmers. We begin by considering the "relevance" of the documents requested. *Leonard*, 38 F.4th at 489; *Mod. Plastics Corp.*, 890 F.3d at 251. Here we generally agree with the district court that Mittapalli's requests are relevant to the underlying Louisiana litigation. To prove his defective-design claim, Mittapalli must show that a safer coupler design was available and feasible. Dethmers's EZ Latch coupler could qualify as a safer alternative. And Mittapalli's subpoena seeks documents and information about Dethmers and its design, manufacture, and sale of the EZ Latch coupler. These topics are at least minimally relevant to Mittapalli's defective-design claim.[4]

But even though Mittapalli can pass the relevance bar, all other factors weigh against enforcement of his subpoena. As noted, the requesting party's "need" to obtain documents from the nonparty is an important factor. *See Jordan*, 921 F.3d at 188–90. When we consider what a requesting party "needs," we must "consider what information is available to the requesting party from other sources." *Id.* at 189. Like the United States Court of Appeals for the Fourth Circuit, we think "the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy

---

[4]In his appellee's brief, Mittapalli announced that he has now settled with U-Haul. Accordingly, Mittapalli now concedes that some of his original requests—particularly, those focused on U-Haul—are no longer relevant to the Louisiana case. Our first task, though, is to decide whether the district court abused its discretion by refusing to quash the subpoenas. We make that determination based on the record that was before the district court. In that record, U-Haul is front and center.

its needs, from one of the parties to the litigation—or, in appropriate cases, from other [nonparties] that would be more logical targets for the subpoena." *Id.*

Mittapalli has not shown need. The record does not show whether Mittapalli has obtained—or could have obtained—the same documents and information from other sources, such as discovery in the Louisiana case or the assistance of retained experts. So Mittapalli has failed to show that he *needs* to impose *any* burdens on Dethmers, a nonparty. This failure is fatal to Mittapalli's subpoena.

We recognize that the district court looked at the matter differently. The court believed

> Dethmers' argument that Plaintiff can obtain what he needs from U-Haul ignores the adversary relationship inherent between opposing litigants and the distinct possibility of lack of full disclosure. In a case of this magnitude, Plaintiff should not be required to seek the very information he needs to prove his case from the user of the product, his opposition [U-Haul], when it is available from the presumed neutral designer and manufacturer [Dethmers].

We disagree for three reasons. First, we note the district court's focus on the "magnitude" of the case—an apparent reference to the extraordinary damages suffered by the plaintiffs in the Louisiana case. We must remember, though, that Dethmers is not a party to that case. Dethmers cannot recover—and it will not be liable for—any damages assessed. So when we consider whether a subpoena imposes "undue burden" *on Dethmers*, the magnitude of the damages involved has relatively less importance.

Second, and relatedly, we disagree with the court's general approach to Dethmers's nonparty status. In the district court's view, it was *better* to impose

discovery burdens on Dethmers *because* it is a "presumed neutral" nonparty *and not* an "opposing litigant." As explained, though, we think the opposite approach is better. To the extent practicable, the burdens of discovery should fall on parties—*not* on nonparties like Dethmers.

Finally, we note that the district court believed Mittapalli's needs could not be fulfilled through adversarial discovery because of the "distinct possibility of lack of full disclosure" by parties to the Louisiana case. But no record evidence suggests that any party to the Louisiana lawsuit has violated any discovery obligation. And, again, we think it was Mittapalli's burden to *demonstrate* his need to impose burdens upon a nonparty by *showing* that party-vs.-party discovery could not produce what he is now asking from Dethmers. *Jordan*, 921 F.3d at 189. At a minimum, this would require proof that Mittapalli had actually sought the subpoenaed documents from parties in the Louisiana case *and* that those parties had failed to produce the documents *despite* reasonable diligence by Mittapalli. Mittapalli has not made this showing here. While the record contains some discovery requests that Mittapalli has apparently served in the Louisiana case, the record does not show (1) what was produced in response, (2) whether the production was inadequate, or (3) what steps Mittapalli has taken to cure the inadequacy, e.g., deficiency letters, motions to compel, and rulings on those motions. Until Mittapalli has "exhausted [his] efforts" to obtain the needed documents through party-vs.-party discovery, he "cannot even begin to argue that [he] has a substantial need to obtain the materials from the non-

parties." *Echostar Commc'ns Corp. v. News Corp.*, 180 F.R.D. 391, 395 (D. Colo. 1998).

We acknowledge Mittapalli's suggestion at oral argument that his expert may need documents from Dethmers to form opinions. Again, though, the record does not support this view. No expert has filed an affidavit that describes a need for particular documents or information within Dethmers's *exclusive* control. Moreover, as Dethmers points out, its EZ Latch coupler is available for purchase in the marketplace. Like Dethmers, we suspect that a qualified engineer would be able to purchase an exemplar, study its design, and provide useful opinions as to whether Dethmers's design was a safer, feasible alternative. While we understand that this would impose costs on Mittapalli, we again emphasize that the burdens of litigation should generally fall on the litigants, not bystanders.

In short, Mittapalli has failed to show a need for the documents requested. In our view, this alone provides an adequate basis to quash Mittapalli's subpoena to nonparty Dethmers. *See, e.g., Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005) ("Since plaintiffs have not shown they have attempted to obtain these documents from defendant, the Court finds that, at this time, requiring nonparty KSA to produce these documents is an undue burden on nonparty KSA.").

We could end our discussion here. In the interest of thoroughness, though, we note that other relevant factors also weigh against enforcement. Consider, for example, the breadth of the requests. *Leonard*, 38 F.4th at 489. Mittapalli's very first request would have required Dethmers to produce "any and all documents

. . . relative to . . . [t]he general scope of Dethmer/Demco's business as it relates to the design, development, and manufacturing of trailer coupling devices." Fairly read, this would have obligated Dethmers to produce every document that relates in any way to Dethmers's trailer-coupling business. And that is just the *first* of Mittapalli's twenty-two requests, many of which are similarly broad. In short, Mittapalli's subpoena was overly broad on its face. This alone could justify quashing the subpoena. *Wiwa*, 392 F.3d at 818 ("A court may find that a subpoena presents an undue burden when the subpoena is facially overbroad.").

We next consider "the time period covered by" Mittapalli's requests. *Leonard*, 38 F.4th at 489 (quoting *Wiwa*, 392 F.3d at 818). Of his twenty-two requests, almost all of them lack clear temporal boundaries. Only two of them specify a relevant time period—a decade-and-a-half-long period from "January 1, 2006 to the present." The temporal breadth of Mittapalli's requests weighs against enforcement.

Next we consider "the particularity with which" Mittapalli "describe[d] the requested documents." *Id.* (quoting *Wiwa*, 392 F.3d at 818). While a few of Mittapalli's requests are particular, many are very general. For instance, request #3 demands that Dethmers produce "any and all documents . . . relative to . . . [f]acts and circumstances surrounding the design, development, and manufacturing of the Demco EZ Latch coupler." We think Dethmers would struggle to know just exactly what this covers and what it does not. This, too, weighs against enforcement.

Finally, we consider the burden imposed on Dethmers. We recall Ten Haken's affidavit testimony that:

> To the extent that we can understand what is being asked of us, the information [required by Mittapalli's subpoenas] would require substantial expense and man-hours to gather. Gathering this information would involve examination of many physical files and computer files. Dethmers' business records are not kept in a way that corresponds with [the subpoenas'] categories. Gathering these records would adversely impact Dethmers' business operations and affect Dethmers' income by devoting man-hours to useless activity instead of profitable activity.

While Ten Haken's affidavit doesn't specify a dollar figure, we think it provides enough detail to show considerable burden. Indeed, even without the benefit of an affidavit, experienced litigators can anticipate that a "large and demanding" request like Mittapalli's would impose substantial financial burdens. *Jordan*, 921 F.3d at 189.

For all of these reasons, we conclude that the district court should have quashed the subpoena for documents. For similar reasons, we also believe that the court should have quashed the subpoena for deposition testimony. The same undue-burden standards apply to both kinds of subpoenas. *Jordan*, 921 F.3d at 193 ("The same undue-burden standard 'applies to both document and testimonial subpoenas.'" (quoting *Watts v. SEC*, 482 F.3d 501, 508 (D.C. Cir. 2007))). And here, the twenty-two categories described in Mittapalli's deposition subpoena are identical to the twenty-two categories described in Mittapalli's document subpoena. As explained, we believe that these demands are facially overbroad.

We note also that special requirements apply when, as here, a subpoena requires depositions under rule 1.707(5),[5] Iowa's counterpart to Federal Rule of Civil Procedure 30(b)(6). Depositions under rule 1.707(5) impose special burdens on the organizations deposed. *See* 8A Charles Alan Wright et al., *Federal Practice and Procedure* § 2103, at 455 (3d ed. 2010) (noting that "the burdens faced" by a corporation responding to a Rule 30(b)(6) deposition "are considerably more challenging than with an ordinary deposition"). The organization must designate persons "who consent to testify on its behalf." Iowa R. Civ. P. 1.707(5). The designees must testify "to matters known or reasonably available to the organization." *Id.* Thus, the organization must prepare the designees so that they can testify *not merely* to "matters personally known to [the] designee[s]," but rather "to *all* information reasonably available" to the organization. *Fuentes v. Classica Cruise Operator Ltd.*, 32 F.4th 1311, 1321–22 (11th Cir. 2022) (first alteration in original) (emphasis added) (quoting *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006)); *see Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 121 (E.D. Mich. 2019) ("A Rule 30(b)(6) witness is obligated to

---

[5]Iowa Rule of Civil Procedure 1.707(5) provides:

A notice or subpoena may name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the witness will testify. A subpoena shall advise a nonparty organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This rule does not preclude taking a deposition by any other procedure authorized in the rules in this chapter.

become educated to the extent possible about the identified topics, although perfection is not expected.").

Preparation like this can be "an onerous and burdensome task." *QBE Ins. Corp. v. Jorda Enters., Inc.,* 277 F.R.D. 676, 689 (S.D. Fla. 2012). It absorbs substantial resources, including employees' time, energy, and focus. Moreover, if the organization "cannot identify the outer limits of the areas of inquiry" for the deposition, compliant designation may not be feasible. *McBride v. Medicalodges, Inc.,* 250 F.R.D. 581, 584 (D. Kan. 2008).

So, like its federal counterpart, rule 1.707(5) obligates the requesting party to "describe *with reasonable particularity* the matters on which examination is requested." Iowa R. Civ. P. 1.707(5) (emphasis added). We interpret this to mean that requests for rule 1.707(5) testimony must be clear and specific about "what is called for and what is not." *Woods v. Standard Fire Ins.,* 589 F. Supp. 3d 675, 684 (E.D. Ky. 2022) (quoting *Alvey v. State Farm Fire & Cas. Co.,* No. 5:17–CV–00023–TBR–LLK, 2018 WL 826379, at *7 (W.D. Ky. Feb. 9, 2018)); *see also Edwards,* 331 F.R.D. at 121 ("Some courts construe 'reasonable particularity' as requiring a notice of deposition under Rule 30(b)(6) to identify topics with 'painstaking specificity.' Plaintiff challenges this construction, but there is no dispute that topics must be stated with enough specificity to allow the corporation to designate and prepare a representative to testify." (quoting *Ga.-Pac. Consumer Prod., LP. v. NCR Corp.,* No. 1:11–CV–483, 2015 WL 11236844, at *1 (W.D. Mich. Feb. 23, 2015))).

Because we have concluded that both subpoenas should be quashed on undue-burden grounds, we need not decide whether Mittapalli's testimonial requests met the reasonable-particularity test. *Murphy v. Kmart Corp.*, 255 F.R.D. 497, 506 (D.S.D. 2009) (noting that the party requesting the deposition must meet the reasonable-particularity requirement). As we emphasized in our discussion of the undue-burden issue, though, we think that many of Mittapalli's requests were too broad and too general. If Mittapalli elects to issue subpoenas to Dethmers in the future, we expect that Mittapalli's demands will be narrow and specific.

Likewise, because we conclude that this case should be resolved on general undue-burden grounds, we need not reach Dethmers's specific concern that Mittapalli's subpoenas required disclosure of "trade secret[s] or other confidential research, development, or commercial information." *See* Iowa R. Civ. P. 1.1701(4)(*d*)(2)(1) (providing protections against disclosure of "a trade secret or other confidential research, development, or commercial information"); *see also Sioux Pharm, Inc. v. Eagle Lab'ys, Inc.*, 865 N.W.2d 528, 538–39 (Iowa 2015) (discussing appropriate measures for the protection of trade secrets). Similarly, we need not reach Dethmers's concern that Mittapalli's subpoenas required disclosure of expert opinions. *See* Iowa R. Civ. P. 1.1701(4)(*d*)(2)(2); *see also Mason v. Robinson*, 340 N.W.2d 236, 237 (Iowa 1983) (en banc) (determining that litigants do not "have an absolute right to compel an unwilling expert to give an opinion on facts outside the expert's personal knowledge"). As we mentioned in our undue-burden analysis, though, we

generally expect that parties in products-liability cases will retain their own privately-paid experts and, to the extent practicable, rely on those experts to fulfill their needs. This, again, is consistent with our view that—to the extent practicable—litigants should bear the burdens of litigation.

Two final notes. First, as mentioned, subsection 4(*d*)(1)(4) provides that "[o]n timely motion, the issuing court must quash *or modify* a subpoena that . . . [s]ubjects a person to undue burden." Iowa R. Civ. P. 1.1701(4)(*d*)(1)(4) (emphasis added). As a general rule, "modification of a subpoena is . . . preferred to outright quashing." *Linder v. Nat'l Sec. Agency*, 94 F.3d 693, 698 (D.C. Cir. 1996). As explained, though, the record here does not show that Mittapalli cannot fulfill his needs through discovery in the Louisiana case, through public information sources, or through his own privately-retained experts. At this stage, then, the record does not show that Mittapalli needs nonparty Dethmers to produce anything.

We also note that in his appellate brief, Mittapalli has advised this court that the nature and scope of the Louisiana litigation has recently changed. After the district court entered the orders at issue here, Mittapalli settled with U-Haul, who was previously the main defendant. Now, the Louisiana case is focused on Horizon Global, who allegedly manufactured the trailer coupler that failed. We think these changes are significant. U-Haul was repeatedly mentioned in the subpoenas, in the hearing on Dethmers's motion to quash, and in the orders from which Dethmers appeals. Conversely, we do not find Horizon Global mentioned in Mittapalli's subpoenas, in the hearing transcript, or in the district

court's orders. Moreover, Mittapalli concedes that his settlement with U-Haul has substantially narrowed his needs for documents and information. Given these circumstances, we believe that it is more appropriate to simply quash the subpoenas before us rather than trying to reform them to fit Mittapalli's current needs, which are not discernable from the record.

Second, we note that if we had instead chosen to only modify the subpoenas and, therefore, to require Dethmers to comply with some of Mittapalli's demands, we would have been obligated to also consider rule 1.1701(4)(*b*)(2)(2). It requires that an order compelling compliance with a subpoena "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Iowa R. Civ. P. 1.1701(4)(*b*)(2)(2). *But see id.* r. 1.1701(4)(*d*)(1) (requiring the subpoenaed party to make timely objection). Like its federal counterpart, the words of this rule

> leave[] no room for doubt that the rule is mandatory. Thus, when discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder "non-significant."

*Legal Voice*, 738 F.3d at 1184; *see Leonard*, 38 F.4th at 490 n.8 (noting Rule 45(d)(2)(B)(ii) "requires a district court to shift a nonparty's cost of complying with a subpoena if those costs are significant"); *Rhea v. Apache Corp.*, 833 F. App'x 186, 190 (10th Cir. 2020) ("An order directing production from a non-party over that party's objection '*must* protect' that party 'from significant expense resulting from compliance.' " (quoting Fed. R. Civ. P. 45(d)(2)(B)(ii))); *see*

*also In re Am. Nurses Ass'n*, 643 F. App'x 310, 314 (4th Cir. 2016) (per curiam) ("Although Fed. R. Civ. P. 45 does not explicitly define what constitutes an 'expense resulting from compliance,' we conclude that attorney's fees incurred by the non-party that are necessary to a discovery proceeding under Rule 45 are expenses that may be shifted to the discovery-seeking party."); *In re Application of Michael Wilson & Partners, Ltd., for Jud. Assistance Pursuant to 28 U.S.C. 1782*, 520 F. App'x 736, 739 (10th Cir. 2013) ("Although Rule 45(c)(2)(B)(ii) protects a nonparty subpoena respondent from 'significant expense,' expenses, including attorney's fees, must be reasonable.").

Because we have elected to quash the subpoenas entirely, however, we are not requiring Dethmers to comply with any of Mittapalli's demands. As a result, we need not (1) evaluate the costs of compliance, (2) determine whether those costs are "significant," or (3) decide what portion of those costs must be shifted to Mittapalli so that the costs imposed upon Dethmers are rendered "non-significant." *Legal Voice*, 738 F.3d at 1184.

**III. Conclusion.**

Mittapalli's subpoenas are overly burdensome on their face. They should be quashed. We reverse and remand for entry of an order quashing the subpoenas. This opinion does not preclude Mittapalli from issuing different subpoenas to Dethmers in the future.

**REVERSED AND REMANDED.**

Waterman, J., files a concurrence, in which Mansfield, J., joins.

#21–1652, *In re Subpoenas Issued to Dethmers Manufacturing*

**WATERMAN, Justice (concurring).**

I join the court's opinion in full. I write separately to comment on the lack of a good-faith effort by counsel to resolve this dispute without court intervention. The full court doesn't discuss the issue because it wasn't raised by the parties to this appeal or addressed by the district court. Fair enough. But this Louisiana case has consumed considerable court time in our state and will consume more on remand. In my view, most discovery disputes can and should be resolved by counsel without court intervention. Our rules of civil procedure generally require lawyers to make a good-faith personal effort to resolve or narrow discovery disputes before filing a motion with the court. That didn't happen in this case.

I agree that the original subpoena was overbroad and unduly burdensome. Mittapalli's counsel, not surprisingly, declined to "bid against himself" and narrow the subpoena when Dethmers's attorney refused to negotiate at all. Dethmers's attorney, at our podium, gave his reason: U-Haul, a key customer and defendant in the Louisiana case, would look askance at any "cooperation" with Mittapalli's lawyer. How did that go for Dethmers? The district court ordered Dethmers to comply with the original subpoena in full. Dethmers's recalcitrance led to this appeal at its expense and a Pyrrhic victory in our court with Mittapalli free after remand to seek a narrower subpoena.

Perhaps if Dethmers's attorney had picked up the phone, all of this time and trouble could have been avoided by a discussion with Mittapalli's lawyer.

Perhaps discussions would have been fruitless. We don't know because Dethmers's lawyer didn't try. One expects that at least their discussions would have further narrowed the dispute before taking up Iowa court time. In my view, counsel shouldn't stonewall and punt the full dispute to the court for business reasons when our rules require good-faith negotiations.

As the lead opinion recognizes, this subpoena in aid of the Louisiana action is governed by Iowa Rule of Civil Procedure 1.1702, entitled "Uniform interstate depositions and discovery." Motions to quash filed by the responding party (Dethmers) "must comply with the rules or statutes of this state" and "[i]n addition, the provisions of [Iowa Rule of Civil Procedure] 1.517 apply to motions brought under this rule." Iowa R. Civ. P. 1.1702(6). Rule 1.517 in turn provides:

> *Motions relating to discovery.* No motion relating to depositions, discovery, or discovery sanctions may be filed with the clerk or considered by the court unless the motion alleges that the movant has in good faith personally spoken with or attempted to speak with other affected parties in an effort to resolve the dispute without court action. The certification must identify the date and time of any conference or attempts to confer.

*Id.* r. 1.517(5); *see also Carter v. Carter*, 957 N.W.2d 623, 634–35 (Iowa 2021) (noting obligation of plaintiffs' counsel to discuss scope of subpoena with nonparty recipient); *Hearn v. Iowa Dist. Ct.*, No. 10–1383, 2011 WL 3480985, at *7 (Iowa Ct. App. Aug. 10, 2011) (noting responding party's failure to comply with the good-faith requirement and stating that "[t]he expense in time and resources devoted to ongoing discovery disputes involving court intervention by all parties to this litigation is unacceptable").

The district court could have simply denied Dethmers's motion to quash based on its failure to comply with our rules requiring that Dethmers certify it made a good-faith effort to speak with Mittapalli's counsel to "resolve the dispute without court action." Iowa Rs. Civ. P. 1.517(5), 1.1702(6). That might have prompted productive discussions.

Some federal courts have held that the "meet and confer" requirement does not apply to a nonparty's motion to quash a subpoena. *See, e.g., Housemaster SPV LLC v. Burke,* No. 21–13411 (MAS), 2022 WL 17904254, at *7 (D.N.J. Dec. 23, 2022) (holding that Federal Rule of Civil Procedure 45, regarding subpoenas, governed rather than Local Rule 37.1, which requires good-faith effort, and stating that "courts have dispensed with requiring a party and non-party to meet and confer prior to filing a motion under Rule 45" and citing cases). Federal cases aren't binding on our interpretation of the Iowa rules. In any event, other federal cases extol the value of the good-faith effort requirement:

> The primary purpose of requiring a meet and confer before filing a motion is not to lessen the Court's workload—although that is often a pleasant result. Genuine, good-faith efforts by the parties to resolve their disputes before seeking Court intervention often result in greater control over the outcome, acceptable compromise, and/or appreciably narrowed issues, thereby saving the litigants unnecessary expense. Thus, it is the policy of this Court—and a requirement under the Local Rules—to have the parties meet and discuss discovery disputes before seeking Court intervention.

*Sheehan Pipe Line Constr. Co. v. Liberty Mut. Ins.,* No. 04–CV–891–JOE–PJC, 2005 WL 8174999, at *2 (N.D. Okla. Nov. 9, 2005); *see also FTC v. Mytel Int'l Inc.,* No. CV 87–7259 GHK (SSx), 2015 WL 13938260, at *2 (C.D. Cal. Oct. 19,

2015) (denying defendants' motion to quash a subpoena issued to nonparty financial institutions because parties failed to meet and confer in good faith).

Regardless, the better practice is for lawyers to try to resolve discovery disputes over nonparty subpoenas before going into court on a motion to quash the subpoena (or to enforce it). We expect that of Iowa lawyers.

Mansfield, J., joins this concurrence.